2009 WY 111

**Ripp CAUSEY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–08–0145.

Supreme Court of Wyoming.

Sept. 4, 2009.

Rehearing Denied Sept. 29, 2009.

288

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Bruce A. Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jenny Lynn Craig, Assistant Attorney General. Argument by Ms. Craig.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶1] Ripp Causey challenges his conviction on one count of aggravated assault and battery. We will affirm his conviction.

## ISSUES

[¶2] Mr. Causey presents these issues:

1. Did the district court properly instruct the jury regarding Mr. Causey's right of self-defense?

2. Did the prosecutor improperly comment on Mr. Causey's right to silence?

## FACTS

[¶ 3] On the afternoon of November 5, 2006, Officer James Frye, of the Lusk Police Department, was dispatched to the home of Sandra Serres. Ms. Serres had called 911 and reported a fight. Upon arriving, Officer Frye observed Mr. Causey standing outside the home. He was bleeding from his head and "was holding a machete." Officer Frye then saw David Howard exit the home. Mr. Howard's hands were bleeding profusely. Around this time, Niobrara Sheriff Deputy Randy Stensaas also arrived at the scene. Deputy Stensaas drew his weapon and ordered Mr. Causey to put the machete on the ground. Mr. Causey complied. Officer Frye and Deputy Stensaas interviewed Mr. Causey, Ms. Serres, and Mr. Howard. After the interviews, Mr. Causey was arrested. An information was subsequently filed charging Mr. Causey with aggravated assault and battery in violation of Wyo. Stat. Ann. § 6–2–502(a)(ii) (LexisNexis 2005)[1] and attempted second-degree murder in violation of Wyo. Stat. Ann. §§ 6–2–104 and 6–1–301.

[¶ 4] The trial testimony revealed a contentious history between Mr. Causey and Mr. Howard. Ms. Serres testified that she previously dated and lived with Mr. Causey. In approximately June 2006, she began dating Mr. Howard. She moved out of the home she shared with Mr. Causey and, soon after, began living with Mr. Howard. She continued to maintain a friendship with Mr. Causey, which added strain to the relationship between Mr. Causey and Mr. Howard. A number of verbal confrontations occurred between Mr. Causey and Mr. Howard after her break up with Mr. Causey. On one previous occasion, a police officer had been called to serve as a "civil standby" to deter a physical confrontation between the two men. Mr. Howard eventually moved out of the home he shared with Ms. Serres, but continued his relationship with Ms. Serres. They were still in an exclusive dating relationship on November 5, 2006.

[¶ 5] On that morning, according to Ms. Serres, she and Mr. Howard helped a friend move. Mr. Howard left after arguing with the friend, and later, Ms. Serres called Mr. Causey to take her home. While Ms. Serres and Mr. Causey were at her home, she received several calls from Mr. Howard. According to the testimony of both Ms. Serres and Mr. Howard, Mr. Causey made several loud comments and threats while Mr. Howard was on the telephone with Ms. Serres, and Mr. Howard could hear Mr. Causey's remarks. Specifically, Mr. Howard testified that Mr. Causey said that "I had no balls, called me a punk." According to Ms. Serres, Mr. Causey stated "[t]hat he would just kill the punk and to bring it on." Mr. Causey offered a different version of the comments. He testified that he and Ms. Serres were having a normal conversation, and that Mr. Howard happened to hear the conclusion of one of Mr. Causey's statements as Ms. Serres answered the telephone.

[¶ 6] In any event, despite Ms. Serres's expressed desire that he not do so, Mr. Howard traveled to her home. When Mr. Causey learned that Mr. Howard was on his way, he went to his vehicle, retrieved the machete, and returned inside. Ms. Serres called the police. Before the police arrived, Mr. Howard and Mr. Causey engaged in a physical altercation. At trial, conflicting evidence was presented regarding details of the fight. For example, Ms. Serres and Mr. Howard testified that Mr. Howard pulled the screen door open and walked past Ms. Serres without touching her. Mr. Causey, in contrast, testified that Mr. Howard "jerked the door out of her hand and shoved her against the wall and never even slowed down."

[¶ 7] Mr. Howard testified that when he entered the residence, he saw "something coming at me, and I threw up my hand, and there was a scuffle after that." Mr. Howard later discovered that the "something" coming at him was Mr. Causey's machete. During the "scuffle," according to Mr. Howard, he grabbed Mr. Causey, shoved him, and eventually ran him out the door and flung him to the ground. Mr. Howard said that Mr. Causey's head injury occurred when he pounded

1.  "A person is guilty of aggravated assault and battery if he: … Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon." Wyo. Stat. Ann. § 6–2–502(a)(ii).

Mr. Causey's head on the ground. Mr. Howard sustained severe cuts to his hands, which required surgery, and he testified that he had not recovered full function of his hands.

[¶ 8] Mr. Causey's trial testimony about the conflict differed from Mr. Howard's version, and also varied in several respects from what he told law enforcement officers soon after the incident. Mr. Causey testified that he turned to leave after Ms. Serres left, but Mr. Howard

> grabbed me by the left arm and the shoulder. He spun me and slammed me into the corner of the wall, the kitchen and the hallway, and cut my head open. He slammed me into the sofa. He slammed me into the desk. He threw me on the floor, started stomping on me.

Mr. Causey described batting ineffectually at Mr. Howard while being struck and kicked, and while Mr. Howard slammed his head down on the floor. Mr. Causey testified that Mr. Howard received his injuries as follows:

> So then I was still bent over looking at the floor, and he was slamming me, and I was trying to get my arm up so I could take another swing at him to get him away from me; and he evidently saw the machete and grabbed it. I didn't realize all these things until later. I was outside what happened. It happened so fast, I didn't realize it at that time; but he grabbed the machete; and I felt him pull on it; and he didn't pull it out of my hand. I don't know how, but I still had a hold of it; and he kind of stepped back a little bit; and he had his hand like this; and I was still bent over; and I was taking a swing and raised up and just made a wild swing at him to back him up; and he raised his arms up a little, and I hit him on this forearm.

Mr. Causey then left. Officer Frye arrived and found him outside.

[¶ 9] Mr. Causey was acquitted of attempted second-degree murder, but found guilty of aggravated assault and battery. The district court sentenced Mr. Causey to 7–10 years imprisonment with credit for time served. He appealed.

## DISCUSSION

### 1. Jury Instructions

[¶ 10] Mr. Causey defended the charges against him by contending that he acted in self-defense. His position on appeal is that the district court did not properly instruct the jury on the law regarding self-defense. His challenge is directed only at Instruction 19, but that instruction is better understood when put in context with all of the self-defense instructions given to the jury:

*Jury Instruction No. 15:*

> Before the defendant may be convicted of Aggravated Assault and Battery or Attempted Second Degree Murder, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. A person being assaulted may defend himself if he has reasonable grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so he may use all force which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent.

*Jury Instruction No. 16:*

> The Defendant was permitted to act in self-defense if he had reasonable cause to believe and did believe that the danger was real and impending and immediate.
>
> It is not necessary that the danger actually was real, or that the danger actually was impending and immediate, so long as the Defendant had reasonable cause to believe and did believe these facts. If the Defendant reasonably believed that danger was real and impending and immediate, he was permitted to act in self-defense even though the other person did not actually intend to harm the Defendant.

*Jury Instruction No. 17:*

> One may arm himself in self-defense only if he has reasonable grounds to believe:
>
> 1.  that another will attack him, and
>
> 2.  that the attack may endanger his life or limb, or cause him serious bodily harm.

If the Defendant armed himself in reasonable anticipation of such an attack, that fact alone does not make the Defendant the aggressor or deprive the Defendant of the right of self-defense.

*Jury Instruction No. 18:*

One who reasonably believes that he is threatened with an attack that justifies self-defense, need not retreat or consider whether he can safely retreat, so long as he does not use deadly force. He is entitled to stand his ground and use such force, as is reasonably necessary under the circumstances to defend himself. This law applies even though the assailed person might have been able to gain safety by flight or by withdrawal from the scene.

Even if the Defendant had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the Defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the Defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the Defendant could have safely retreated but failed to do so, and that the Defendant used deadly force, the Defendant cannot rely on the justification of self-defense.

*Jury Instruction No. 19:*

The right of self-defense is not available to one who is the aggressor or provokes the conflict.

Where two individuals mutually agree to fight, both are considered aggressors, making a self-defense theory unavailable to either of them.

If one provokes a conflict and thereafter withdraws from it in good faith and informs his adversary by words or actions that he wants to end the conflict, and he is

thereafter attacked, he then has the same right of self-defense as any other person.

These self-defense instructions closely follow the language of the Wyoming Criminal Pattern Jury Instructions. *See* W.Cr.P.J.I. 8.05, 8.08–8.11. Instruction 19, the one challenged by Mr. Causey, is nearly a word-for-word recitation of W.Cr.P.J.I. 8.04, with the addition of a sentence about mutual combatants drawn from *Leeper v. State,* 589 P.2d 379, 383 (Wyo.1979).

[¶ 11] Carefully analyzed, Mr. Causey's appeal raises two separate objections to Instruction 19. First, he claims that the instruction should not have been given to the jury because the evidence was insufficient to support any finding that he was the aggressor. Second, he claims that the phrase "provoke the conflict" has a specialized meaning in the context of self-defense, and that the instruction was inadequate because it did not define the phrase in accordance with that specialized meaning. We consider each of the two objections in turn.

[¶ 12] At trial, during the instruction conference, the district court gave counsel copies of the instructions it planned to give the jury, and asked if there were any objections. Counsel for Mr. Causey replied, "One objection. I want to object, to argue that there is not enough proof that Mr. Causey was the aggressor to warrant this instruction." Though not specifying Instruction 19, the objection in context is fairly read as an objection to that particular instruction. The district court overruled the objection, and gave Instruction 19 to the jury.

[¶ 13] A trial court is given wide latitude in instructing the jury, and its decisions regarding instructions will be upheld if they are supported by any competent evidence. *See Iseli v. State,* 2007 WY 102, ¶¶ 9–10, 160 P.3d 1133, 1135–36 (Wyo.2007). Our review of the record discloses competent evidence to support the district court's ruling. Key to this determination is the trial testimony of Mr. Howard, excerpted as follows:

I walked in the door, walked past [Ms. Serres] ... I don't remember if she had her hand on the door or not. I just opened the door and walked in and said something to her. I don't remember exactly what I

said.... I started to turn around and seen something coming at me, and I threw up my hand, and there was a scuffle after that.... I did not attack [Mr. Causey].

In Mr. Howard's version of this incident, Mr. Causey was the aggressor. It is true that Mr. Causey provided an alternative version, in which Mr. Howard was the aggressor, but our task is not to weigh the evidence, only to determine whether the district court could reasonably conclude that there was competent evidence from which the jury might find that Mr. Causey was the aggressor. If the jury believed Mr. Howard, that was enough. The district court did not err in overruling Mr. Causey's objection and giving Instruction 19 to the jury.

■ [¶ 14] Mr. Causey's second objection, the one given most of the attention in his brief, is that Instruction 19 did not provide the legal definition of the phrase "provokes the conflict." In his brief, Mr. Causey asserts that provocation "is a term of art describing a narrow class of conduct intentionally contrived to manufacture a claim of self-defense." He initially cites this explanation from another jurisdiction:

> The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.

*Smith v. State,* 965 S.W.2d 509, 512 (Tex. Crim.App.1998). He then builds support for his contention from Wyoming precedent, beginning with *State v. Flory,* 40 Wyo. 184, 276 P. 458, 462–63 (1929), in which we explained that:

> Not every provocation, of course, will deprive a man of his right of self-defense. It must be one reasonably calculated to lead to an affray.... If the slayer provoked the combat or produced the occasion in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat.

He moves on to *State v. Radon,* 45 Wyo. 383, 19 P.2d 177, 182 (1933), in which we approved of a jury instruction with this language:

You are further instructed that if you believe from the evidence that the defendant provoked the difficulty or began the quarrel *with the purpose of taking advantage of the deceased, and of taking his life, or doing him some great bodily harm,* then there is no self-defense in the case.

(Emphasis added.) He moves forward to *State v. Bristol,* 53 Wyo. 304, 84 P.2d 757, 765–66 (1938), then to *Cullin v. State,* 565 P.2d 445, 451 (Wyo.1977), in which we stated that, given the evidence adduced at trial, "[I]t became a jury decision to finally determine whether defendant's provocation was *calculated to create an occasion in order to afford her an opportunity to kill or seriously injure the deceased.*" (Emphasis added.) Based on his position that the phrase "provokes the conflict" has this particularized meaning under the law of self-defense, Mr. Causey contends that the phrase should have been defined for the jury.

[¶ 15] The State responds that the word "provoke" has a common meaning, and is readily understood by jurors. The State invokes the proposition that "[a] court need not give an instruction defining a term unless it has a technical legal meaning so different from its ordinary meaning that the jury, without further explanation, would misunderstand its import in relation to the factual circumstances." *Butz v. State,* 2007 WY 152, ¶ 19, 167 P.3d 650, 655 (Wyo.2007). On that basis, the State argues that the district court did not err in failing to define the phrase.

[¶ 16] In sum, the State's position is that the word provoke should be used in its colloquial sense, and it was unnecessary to define this common term for the jury. Mr. Causey's position is that the word provoke has a specialized legal meaning, and should have been defined for the jury. Mr. Causey admits that he called Mr. Howard names and commented on his anatomy, but contends that he did not do so for the purpose of contriving an opportunity to injure or kill Mr. Howard. Further, Mr. Causey urges us to hold as a matter of law that "mere verbal insults" cannot constitute the provocation necessary to forfeit the right of self-defense. In contrast to the State, Mr. Causey con-

tends that the word "provoke" must be used in a specialized legal sense, and that the jury should have been informed of this definition.

[¶ 17] We are precluded from resolving this dispute, however, because Mr. Causey did not raise these issues before the district court. W.R.Cr.P. 30(a) provides, in pertinent part, that:

> Before instructing the jury the court shall ... afford [counsel] an opportunity to offer specific, legal objection to any instruction the court intends to give and to offer alternate instructions. No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury is instructed, stating distinctly the matter to which the party objects and the grounds of the objection.

At trial, Mr. Causey objected to Instruction 19, but solely on the basis that there was insufficient proof that Mr. Causey was the aggressor. He made no objection aimed at the phrase "provoking the conflict." He presented no argument to the district court that the phrase had a specialized legal definition, and he offered no alternate instruction defining the phrase. We have stated repeatedly that an objection is not properly preserved on appeal unless the objection was made at trial. *E.g. Sanderson v. State*, 2007 WY 127, ¶ 13, 165 P.3d 83, 88 (Wyo.2007); *Bush v. State*, 2008 WY 108, ¶ 29, 193 P.3d 203, 210 (Wyo.2008). "The objector should lay his finger on the particular point intended to be raised so that the trial court will have notice and an opportunity to cure the alleged error." *Valerio v. State*, 429 P.2d 317, 319 (Wyo.1967), quoting *Murdock v. State*, 351 P.2d 674, 679 (1960).

[¶ 18] While Mr. Causey did not raise this objection at trial, still "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." W.R.A.P. 9.05; W.R.Cr.P. 52(b); *see Seaton v. State. Highway Comm'n Dist. No. 1*, 784 P.2d 197, 206 (Wyo.1989). "Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially prejudiced him." *Guy v. State*, 2008 WY 56, ¶ 9, 184 P.3d 687, 692 (Wyo.2008), quoting *Talley v. State*, 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo.2007).

[¶ 19] In his appellate brief, Mr. Causey provides no plain error analysis of the asserted error. On this basis alone, we could decline to consider his argument. *Schultz v. State*, 2007 WY 162, ¶ 18, 169 P.3d 81, 87 (Wyo.2007). If we must supply that analysis, we proceed from the well-established precept that plain error will be found "only in exceptional circumstances." *Hays v. State*, 522 P.2d 1004, 1007 (Wyo.1974). Under the plain error standard of review, we reverse a trial court's decision only if it is so plainly erroneous that the judge should have noticed and corrected the mistake even though the parties failed to raise the issue. "To charge the trial court with the duty of protecting defendant's right[s] ..., thereby relieving the attorney of that obligation, would be an exercise in role-switching which we are not ready to condone." *Connolly v. State*, 610 P.2d 1008, 1011 (Wyo.1980). "We cannot allow defendant or his counsel to place the burden of the defense upon a trial judge." *Gallup v. State*, 559 P.2d 1024, 1026 (Wyo.1977). "Nor is it proper that this court be forced to assume that burden." *Johnson v. State*, 562 P.2d 1294, 1299 (Wyo.1977). Accordingly, reversal is justified under the plain error standard of review "only in those rare circumstances where the rights lost by appellant were too blatant to assume the trial judge needed them brought to his attention." *Hatheway v. State*, 623 P.2d 741, 748 (Wyo. 1981) (Raper, J., concurring). That is why, in a plain error analysis, the Appellant must demonstrate "the existence of a clear and unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way." *Hampton v. State*, 558 P.2d 504, 507 (Wyo.1977).

[¶ 20] The error that Mr. Causey brings to our attention was not an obvious transgression of any clear and unequivocal rule of law. He does not cite any Wyoming case establishing a clear-cut rule of law that the jury must be instructed on a specialized legal definition of provocation. Instead, he

relies on a detailed analysis of self-defense cases dating back eighty years. None of those cases directly raised the question of how or whether a jury should be instructed on the definition of provocation. Instead, they dealt with related issues such as the duty of an aggressor to retreat, *see Flory*, 276 P. at 463, or the sufficiency of the evidence to support an instruction on aggression and provocation. *See Radon*, 19 P.2d at 182, *Bristol*, 84 P.2d at 765–66, and *Cullin*, 565 P.2d at 451. A specialized legal definition of the phrase "provokes the conflict" can be derived only through a meticulous examination of the subtle discussions contained in these cases.

[¶ 21] If the issue were properly before us, we might well agree with Mr. Causey's thoughtful analysis of the definition of "provokes the conflict." But even if we accepted that specialized definition now, it would not establish that, during Mr. Causey's trial, the failure to define the phrase was so plainly erroneous that the judge should have noticed and corrected the mistake even though the parties failed to raise the issue. Similarly, Mr. Causey cites no Wyoming case establishing that verbal insults alone cannot constitute provocation. He relies solely on cases from other jurisdictions, many of which are cited in *State v. Riley*, 137 Wash.2d 904, 976 P.2d 624, 629 (1999). But even if we were to follow those other jurisdictions at this point, that ruling would not demonstrate that any clear and unequivocal rule of Wyoming law was violated during Mr. Causey's trial. We conclude that the self-defense instructions given by the district court were not plainly erroneous, and do not require reversal of Mr. Causey's conviction.

## 2. Prosecutorial Misconduct

[¶ 22] The second issue in this appeal is a claim that the prosecutor improperly commented on Mr. Causey's exercise of his right to silence. The right to remain silent when accused of a crime is founded on the Fifth Amendment to the United States Constitution and on Article 1, Section 11 of the Wyoming Constitution, and we have referred to it as "one of the most fundamental rights accorded a defendant in our criminal justice system." *Williams v. State*, 2004 WY 117, ¶ 18, 99 P.3d 432, 444 (Wyo.2004). We protect this right zealously. *See Westmark v. State*, 693 P.2d 220, 225 (Wyo.1984). For example, we have established that a prosecutor's comments on a defendant's silence are inherently prejudicial, and entitle the defendant to a reversal of his conviction. *Summers v. State*, 725 P.2d 1033, 1048–49 (Wyo. 1986). We have explained, however, that:

> A prosecutor does not "comment" on a defendant's exercise of his right to silence where he does not attempt to use the silence to the state's advantage, [or] where he does not argue to the jury that the silence was evidence of guilt or an admission of guilt.

*Teniente v. State*, 2007 WY 165, ¶ 23, 169 P.3d 512, 523 (Wyo.2007). To determine if a prosecutor has made an improper comment on the right to silence, we review the record as a whole and place the prosecutor's questions and statements in the context of the entire trial. *Spinner v. State*, 2003 WY 106, ¶ 19, 75 P.3d 1016, 1024 (Wyo.2003).

[¶ 23] In this case, Mr. Causey voluntarily gave extensive statements to law enforcement officers at the scene of the incident. His description of the events at that time was substantially different from the description he provided later at trial. The prosecutor highlighted the differences through the testimony of the law enforcement officers. For example, the prosecutor questioned one officer as follows:

Q. Officer Frye, let me skip ahead a little bit and ask you if you ever had the opportunity while you were there to talk with the defendant, Ripp Causey?

A. Yes, I did....

Q. Did he ever say at any point in your conversation that he tried to leave?

A. No, he didn't.

Q. Did he ever say at any point, ever, in your conversation with him that he tried to start his truck?

A. No, not at any time.

Q. Did he ever tell you or say that he had told Sandra to call the police?

A. No, he never did.

Q. Did he ever tell you that he tried to get out of the front door?

A. No.

Q. Did he ever say that David Howard attacked him from behind?

A. No.

Q. Did he ever say that David Howard pulled his hair?

A. No, not at any time. . . .

Q. Did he say anything about what his intentions were with the machete?

A. He did state that he was going to try to take [David Howard's] head off.

The prosecutor asked similar questions of Deputy Stensaas. The prosecutor also pointed out inconsistencies when cross-examining Mr. Causey:

Q. The truth of the matter, however, is you never mentioned that [you tried to leave but your truck would not start] to the law enforcement officers on November 5, 2006, did you?

A. They never asked.

Q. Do you think it's an important fact?

A. I was just answering their questions.

Q. So when they told you you were under arrest, you didn't say, hey, I tried to leave.

A. Yes, I did.

Q. Oh, you told them you tried to leave in the truck?

A. Well, no. Wait. I didn't say I tried to leave. . . .

Q. You . . . never did tell them you tried to leave, did you?

A. They never asked.

[¶ 24] Although Mr. Causey offered no objection to these questions at trial, he now contends that the prosecutor's questions amounted to improper comment on his right to remain silent. A review of the entire record convinces us, however, that the prosecutor was not commenting on Mr. Causey's silence, but was instead emphasizing that Mr. Causey's trial testimony about the incident was different from what he related to the officers just after the incident occurred. Comparing inconsistent versions of an occurrence is a reasonable way to cast doubt on the credibility of a witness.

A defendant may not exploit his or her voluntary and informed responses to official interrogation without understanding that the door swings both ways, affording the prosecution a similar opportunity to make some comment over what [he] said or neglected to say.

*Sturgis v. State*, 932 P.2d 199, 205 (Wyo. 1997). We conclude that the prosecutor's questioning amounted to comments on what Mr. Causey said or neglected to say rather than comments on the exercise of his right to silence. In comparable circumstances, we decided that it was not reversible error for a prosecutor to ask a defendant about his "decision to withhold information from the officers" after he had "agreed to talk with police." *Emerson v. State*, 988 P.2d 518, 522 (Wyo.1999) (emphasis omitted). In Mr. Causey's case, it was not improper for the prosecutor to question the witnesses as a way of highlighting inconsistencies in Mr. Causey's different versions of the events.

[¶ 25] We are more troubled by the prosecutor's statement during closing argument about those inconsistencies:

Third [inconsistency]—and I have gone over this, and I don't want to belabor it, he says he tried to leave. First thing, early on, he never told the police that, either one of the officers. He never told the police, and what was his excuse, "They didn't ask me." If you are holding a machete outside and the police show up, and then they start to arrest you or something like that, you want to say, well, here is what was going on. You try to explain yourself. I was trying to get out of here. He was after me. I tried to get out of here. I tried to leave.

That didn't happen. Never said that. No evidence of that.

The remarks drew no objection from Mr. Causey at the time.

[¶ 26] In isolation, the prosecutor's remark could appear to be an impermissible comment on Mr. Causey's post-arrest silence. When considered in context, however, we conclude that the prosecutor was instead making a permissible argument about the evidence presented at trial. As noted before, statements Mr. Causey gave the officers just

before and after his arrest differed significantly from his trial testimony. We have already determined that the prosecutor was entitled to question the witnesses about those differences. After evidence of the inconsistencies had been admitted, it was appropriate for the prosecutor to point out the inconsistencies in closing argument. Placed in context with the evidence, the prosecutor's closing argument appears more of an attempt to convince the jury that Mr. Causey's trial testimony was not credible, and less of an effort to convince the jury that Mr. Causey's silence was evidence of his guilt. We conclude that the prosecutor's closing argument was not an attempt to use Mr. Causey's silence to the State's advantage, *compare Teniente,* ¶ 23, 169 P.3d at 523, and was, therefore, not an impermissible comment on the right to silence.

[¶ 27] Mr. Causey has not demonstrated reversible error based on either of the issues he raises on appeal. We therefore affirm the conviction.