2017 WY 123

**Mario G. BARRERA, Appellant**
**(Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**S-16-0296**

Supreme Court of Wyoming.

October 13, 2017

Representing Appellant: Office of the State Public Defender: Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Eric M. Alden, Senior Assistant Public Defender. Argument by Mr. Alden.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General. Argument by Ms. Martens.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

DAVIS, Justice.

[¶1] Mario Barrera appeals his felony conviction for taking a controlled substance into a jail.[1] The statute governing that offense, Wyo. Stat. Ann. § 6-5-208 (LexisNexis 2017), provides in pertinent part, "Except as authorized by a person in charge, a person commits a felony ... if that person takes or passes any controlled substance or intoxicating liquor into a jail[.]" We affirm.

## ISSUES

[¶2] Barrera raises three issues. We restate and rearrange them as follows.

I. Can an arrestee, whose presence at a jail is involuntary, nevertheless voluntarily take controlled substances into the jail in violation of § 6-5-208?

II. Is a booking area part of a jail for purposes of § 6-5-208?[2]

III. Did the State's theory and argument deprive Barrera of his Fifth Amendment right to be free from compelled self-incrimination?

## FACTS

[¶3] Gillette police officers Overton, Dillard, and Foutch responded to a reported bar fight at approximately 2:13 a.m. on January 30, 2016. Several men had allegedly left the scene, leaving one man unconscious in the establishment's parking lot. After interviewing witnesses and obtaining descriptions of some of the participants in the fight, the officers began to check vehicles in the parking lot to determine whether any of those involved—particularly, a heavy-set Hispanic male and a female who had left her purse behind—might still be present.

[¶4] Eventually, Officer Overton encountered the heavy-set Barrera, a female driver, and a second man in a red Chevrolet pickup truck. He detected a faint odor of marijuana, and Officer Foutch spotted a pistol in a map pocket on the driver-side door. Consequently, the officers asked all of the occupants to get out of the vehicle and patted them down for weapons. When Barrera exited from the front passenger seat, he handed the officers two open bottles of beer. Officer Dillard then ran his drug dog around the car, and upon the dog's alerting to the presence of controlled substances, the officers searched the interior of the truck. In the woman's purse they found approximately four grams of marijuana and a small baggie containing what they suspected to be methamphetamine. She was arrested for possession of those substances. The officers also located marijuana residue in the cup holders in the front console.

[¶5] Shortly thereafter, Officer Foutch arrested Barrera for a violation of Gillette's open container ordinance and searched him to a limited extent incident to that arrest. After discovering cigarette rolling papers during that search, Foutch advised him twice that he would be searched more thoroughly at the jail and that he would face additional charges if he had any drugs on him and took them into the jail. On both occasions Barrera said he had nothing on him. The officer similarly advised Barrera a third time while transporting him to the jail, and he again received the same response.

[¶6] After proceeding into the county detention facility's secured garage, Foutch turned Barrera over to Detention Officer Kellison, who showed and read him a sign on a door to the secured passageway leading into the jail. The sign advised that he would be charged with a felony if he brought any illegal substances or liquor into the jail. Kellison asked whether he had any such items on his person, and Barrera said, "No." The three men then entered the passageway, and the jail control center remotely closed and secured the door behind them and opened a door at the other end of the passage into the jail's booking area. The second door had a

---

1. In the same proceeding he was also convicted of misdemeanor possession of a controlled substance, but he directs all of his appellate issues to the felony conviction.

2. As his brief seems to concede, although Barrera raises this in the context of a sufficiency of the evidence claim, he can prevail on that claim only if this Court adopts his interpretation of the statute.

sign with the same warning as the first. Officer Foutch remained in the booking area to prepare his initial intake paperwork relating to Barrera.

[¶7] In the meantime, Officer Kellison searched Barrera, emptying his pockets and inventorying the personal items he found. Kellison found a very small baggie in the watch pocket on the right side of Barrera's pants. It contained slightly more than 1.8 grams of what was later identified as methamphetamine.

[¶8] On February 1, 2016, Barrera was charged with the felony of taking methamphetamine into a jail under the statute noted above. In mid-June, the parties stipulated to the joinder of that charge with a misdemeanor count of possessing methamphetamine that had been filed in the circuit court.

[¶9] On April 15, 2016, Barrera filed a motion to dismiss the felony charge. He argued that § 6-5-208 required proof that he voluntarily took or passed a controlled substance into the jail, but that he could not have done so voluntarily because he was under arrest and under the physical control of law enforcement officers when he entered the jail.

[¶10] A hearing was held on May 2, 2016, and on July 15 the district court issued an order denying the motion. The court concluded that Barrera's argument echoed the position of the minority of courts that found that an arrested person did not voluntarily enter a jail. However, the court preferred the majority view to the contrary because it focused on and did not discount the fact that, in seemingly all of the reported cases, the defendants had been advised of the consequences of introducing drugs into the jail and made a choice to do so. In short, regardless of what caused Barrera to be in the position of having to make that choice, the district court believed that the majority view recognized that the decision to continue to conceal drugs was itself a voluntary act sufficient to support a conviction under § 6-5-208. It also concluded that the minority position would exclude arrestees and inmates from the reach of that statute, to the detriment of the legislative intent of preventing the introduc-tion and use of drugs in jails and penal institutions.

[¶11] On July 8, 2016, at the conclusion of a two-day jury trial, Barrera was found guilty of both offenses. He was sentenced to twenty to thirty-six months of incarceration and a $3,000 fine on the felony conviction. The prison sentence was suspended in favor of three years of supervised probation. On the misdemeanor conviction, he was sentenced to time served. He timely perfected this appeal.

## DISCUSSION

### Can an Arrestee Voluntarily Take Controlled Substances into a Jail?

 [¶12] Barrera and the State both correctly note that Wyo. Stat. Ann. § 6-5-208 describes a general intent crime, and that such crimes must be committed voluntarily. Barrera argues, as he did below, that for the purposes of that statute he could not voluntarily take methamphetamine into the jail in Gillette because he was an arrestee, and his presence in the jail was involuntary. He thus raises a question of statutory interpretation subject to de novo review by this Court. *Vance v. City of Laramie*, 2016 WY 106, ¶ 11, 382 P.3d 1104, 1106 (Wyo. 2016). When interpreting statutes, we focus on legislative intent as expressed by the ordinary and obvious meaning of the language employed therein. *Id.* ¶ 12, 382 P.3d at 1106.

[¶13] As noted above, Barrera's argument invokes a minority position that a defendant's presence in a jail must be voluntary to violate the statute. In our view, that position amounts to saying that only one of a defendant's choices is significant: if he has not chosen to be present in the jail, he is immune from the reach of the statute, no matter how firm his intent to take his drugs with him. Moreover, as an inmate, he would likewise be immunized if, after an authorized sojourn outside the facility for purposes of work or medical attention, he chose to return with drugs made available by a confederate during his release. His return to the jail would be no more voluntary than his initial entrance as an arrestee.

[¶14] In contrast, courts adopting the majority position focus on a choice actually

made by arrestees after they have been advised that a failure to disclose they were carrying drugs prior to entering a jail would result in a felony prosecution. *See State v. Cargile*, 123 Ohio St.3d 343, 916 N.E.2d 775 (2009). In that case, an intermediate appellate court applied the minority rule. The Ohio Supreme Court reversed and remarked, "He was made to go into the detention facility, but he did not have to take the drugs with him." *Id.* ¶ 13, 916 N.E.2d at 777. *See also Taylor v. Commonwealth*, 313 S.W.3d 563, 565-66 (Ky. 2010); *Brown v. State*, 89 S.W.3d 630, 633 (Tex. Crim. App. 2002) (en banc) (arrestee's taking marijuana into jail after advice as to consequences is voluntary so long as the referenced act, omission, or possession is not accidental).

[¶15] In effect, those courts look to the gravamen of the subject offense, introducing or causing the introduction of controlled substances into a jail, and hold that so long as that conduct was a product of a voluntary choice, the defendant need not have chosen to be inside the jail. This approach is consistent with our view that, as far as intention goes, general intent crimes require proof only that the prohibited conduct was undertaken voluntarily. *Seymore v. State*, 2007 WY 32, ¶ 13, 152 P.3d 401, 406 (Wyo. 2007), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, 193 P.3d 266 (Wyo. 2008) (citing *Reilly v. State*, 2002 WY 156, ¶¶ 8-9, 55 P.3d 1259, 1262-63 (Wyo. 2002)).

[¶16] In reviewing an Arizona statute which in part closely mirrors § 6-5-208, an appellate court criticized the minority position by explaining the conduct that was prohibited by the statute. *State v. Alvarado*, 219 Ariz. 540, 200 P.3d 1037 (Ariz. Ct. App. 2008). It first observed that the minority position rests on the infirm premise that a defendant lacks any control over his person once he has been arrested, even when he has been advised of the consequences of taking drugs into a jail and has denied having any, choosing instead to ignore the advice and commit a felony. *Id.* at 1040. The court further noted that the minority position not only ignored that the voluntary act at issue was the effectuation of that choice, but that it unjustifiably made a defendant's voluntary presence in a jail an element of the offense. By doing the latter, the minority made the statute apply only to those who were neither arrestees nor inmates. That limitation, however, did not appear in the plain language of the statute. *Id.* at 1041-42.

[¶17] We believe the *Alvarado* court's analysis of the Arizona statute is sound and applicable to Wyo. Stat. Ann. § 6-5-208. The clear and unambiguous wording of our statute authorizes the punishment of "a person" who "takes or passes any controlled substance ... into a jail." Taking and passing share the common function of introducing or causing the introduction of a prohibited substance into a jail, and are voluntary so long as they are the product of choice. This is the substance or gravamen of the crime for which Barrera was prosecuted, and it exists wholly independent of whether one chooses to be in a jail.

[¶18] Moreover, our statute places no limitation on the meaning of the word "person." The legislature gave no sign it intended to exclude arrestees and inmates from the reach of that term, but adoption of the minority position would effectively create such an exclusion under the guise of statutory interpretation. We therefore reject Barrera's position in this regard.

### Is the Booking Area Part of the Jail?

[¶19] As noted above, Barrera poses a question as to the meaning of the word "jail" in § 6-5-208, but frames it as a sufficiency of the evidence issue. In such cases, this Court treats the question as one of statutory interpretation. *KP v. State*, 2004 WY 165, ¶ 22, 102 P.3d 217, 224 (Wyo. 2004).

[¶20] However, Barrera never put this question before the district court in any fashion. When a defendant fails to offer an instruction or otherwise bring a question of law to the trial court's attention, he cannot have the question considered on appeal unless he establishes plain error. He must show that the court somehow clearly and obviously, not merely arguably, violated a clear and unequivocal rule of law and thereby materially prejudiced him. *Vaught v. State*, 2016 WY 7, ¶¶ 13, 14, 366 P.3d 512, 515-16 (Wyo. 2016);

*Kovach v. State*, 2013 WY 46, ¶ 79, 299 P.3d 97, 122 (Wyo. 2013). We may altogether decline to entertain his allegation if he fails to provide any plain error analysis. Moreover, we will not find plain error except in those exceptional circumstances where the error was so blatant that the judge should not have needed it brought to his attention. *Causey v. State*, 2009 WY 111, ¶ 19, 215 P.3d 287, 293 (Wyo. 2009).

[¶21] That is certainly not the case here. Barrera's position is that a booking area, such as the one into which he carried and was discovered with methamphetamine, is not part of a jail, and that he consequently never took drugs into a jail. However, the alleged truth of that proposition is not evident from the language of the statute or any cases decided by this Court.

[¶22] The term "jail" is not statutorily defined, and common definitions of the term provide little to nothing to support Barrera's position. A jail is often described simply as a place of confinement for persons who are awaiting trial, or who have been convicted of minor crimes, under the jurisdiction of a local governmental entity. *See* http://www.merriam-webster.com/dictionary/jail. It is likewise often defined as a building designated by law, or regularly used, for the confinement of persons held in lawful custody. *See* http://thelawdictionary.org/jail. The booking process occurs after an arrest. It typically involves officers taking the criminal suspect's personal information; recording information about the alleged crime; preliminarily searching records regarding the suspect's criminal background; fingerprinting, photographing, and searching the suspect; and confiscating any personal property he may be carrying. *See* http://criminal.findlaw.com/criminal-procedure/booking/html.

[¶23] Barrera's argument starts from the accurate observation that jails are often housed in complexes that also accommodate court facilities, law enforcement agencies, or both, and reasonably suggests that the entire complex should not be deemed a jail for the purposes of § 6-5-208 solely by virtue of sharing a common roof. We agree that the word "jail" should not be so broadly construed. We do not agree, however, with Bar-rera's conclusion that the word should be so narrowly construed as to embrace little more than the areas where inmates sleep and eat.

[¶24] To resolve his claim in this case, we need not endeavor to exhaustively or conclusively define what constitutes a jail. We need only look to the functions performed during the booking process, as described above, and note the security limiting entry to and exit from the booking area to conclude that the area was not so blatantly something other than a portion of a jail as to bring Barrera's claim within the realm of plain error.

**The Fifth Amendment Issue**

[¶25] Barrera asserts that the prosecutor's closing argument violated his rights under the Fifth Amendment of the United States Constitution. That is, he contends the prosecutor used his silence regarding his possession of methamphetamine to prove that he entered the jail after having made a voluntary choice to do so while still in possession of the drug. This assertion was not previously raised in the district court. Consequently, Barrera bears the burden of establishing plain error.

[¶26] We have made it clear that a prosecutor violates the Fifth Amendment's proscription against compelled self-incrimination if he puts on evidence or presents argument that constitutes a "comment" on the defendant's exercise of his right to silence. *Causey*, ¶ 22, 215 P.3d at 294. However, testimony or argument does not constitute such a comment unless it is used to convey that the defendant's silence is evidence of or an admission of guilt. Referring to what the defendant said, and even highlighting omissions in his statements and comparing or contrasting them to other trial evidence, are not impermissible comments. *Id.* ¶ 24, 215 P.3d at 295.

[¶27] The parts of the record to which Barrera directs us cannot accurately be described as comments which improperly used silence as to his possession of methamphetamine to prove he voluntarily carried it into the jail. To the contrary, in each instance the prosecutor used the fact that Barrera was repeatedly informed of the consequences of carrying drugs inside—along with, not his

silence, but his repeated denials that he was in possession of drugs—to show that he had made a difficult choice between two undesirable options.

[¶28] These are not impermissible comments under Wyoming law. Thus, Barrera cannot satisfy his obligation under the plain error test of showing that the prosecutor's argument obviously violated an established unequivocal rule of law.

## CONCLUSION

[¶29] Wyo. Stat. Ann. § 6-5-208 applies to arrestees like Barrera who carry controlled substances into the booking areas of jails, and prosecutorial argument that such an arrestee denied possessing drugs after being warned about the consequences of violating that statute do not violate his Fifth Amendment rights. Barrera's conviction is therefore affirmed.

KAUTZ, J., dissenting, in which FOX, J., joins.

[¶30] I agree with the majority opinion's conclusions about the definition of "jail." I recognize that the majority opinion on the voluntariness of "taking" by someone who is arrested and involuntarily taken to jail adopts a position adopted by most states that have addressed the issue. However, I find the minority position more persuasive, and more consistent with the logical meaning of "taking" as that term is used in Wyo. Stat. Ann. § 6-5-208 (LexisNexis 2017). Accordingly, I respectfully dissent.

[¶31] Section 6-5-208 is plain in its language. This statute simply states that a person is guilty of a felony "if that person takes or passes any controlled substance ... into a jail ...." Because this statute does not require any specific intent on the part of the actor, it is a general intent crime. However, "even a general intent crime requires a showing that the prohibited conduct was undertaken voluntarily." *Rowe v. State*, 974 P.2d 937, 939 (Wyo. 1999) (citing *Crozier v. State*, 723 P.2d 42, 52 (Wyo.1986)). An act is voluntary if the actor intended to do it (as opposed to an event occurring accidentally or involuntarily). "When the statute sets out the offense with only a description of the particular unlawful act, without reference to intent to do a further act or achieve a future consequence, the trial judge asks the jury whether the defendant intended to do the outlawed act." *Reilly v. State*, 2002 WY 156, ¶ 8, 55 P.3d 1259, 1262 (Wyo. 2002) (quoting *Dorador v. State*, 573 P.2d 839, 843 (Wyo. 1978)).

[¶32] In this case, the State accused Mr. Barrera of voluntarily taking a controlled substance into a jail. To prove Mr. Barrera guilty, the State had to prove Mr. Barrera voluntarily took the controlled substances into the jail—that he intended to do so. The evidence showed only that Mr. Barrera intended to possess the controlled substance by placing it in his coin pocket. It did not show he voluntarily took it into the jail, or that he ever had such intent.

[¶33] An act may be voluntary if the actor has a choice to not commit the act, but declines that choice and goes ahead with the act. The State argues that the officers gave Mr. Barrera a choice to not "take" the controlled substance into the jail when they advised him on several occasions that "he would be strip searched at the jail and that it would be a felony if he was concealing any narcotics on his person and if he took it into the jail." The option the officers gave Mr. Barrera was to confess to possession (assuming he remembered that he had the small amount of controlled substance in his coin pocket). In fact, they required him to confess or face a felony charge. Mr. Barrera's response did not indicate that he intended to take controlled substances into the jail. Rather, it only indicated he either was unaware of the controlled substance or he wished to avoid self-incrimination.

[¶34] The officers did not give Mr. Barrera the option of not answering them. They did not ask if he wished to waive his privilege against self-incrimination. They did not tell him that they would search him at the jail and if he was found in possession of a controlled substance he would be charged with that crime. Instead, they threatened him with a more substantial crime—a felony—if he did not confess to possession. The officers essentially required Mr. Barrera to confess.

[¶35] One of the most fundamental elements of American liberty is the protection of citizens from compulsory confession to crimes. The Fifth Amendment to the United States Constitution is well-known: "No person ... shall be compelled in any criminal case to be a witness against himself." Article 1, Section 11 of the Wyoming Constitution reiterates the principle: "no person shall be compelled to testify against himself in any criminal case." Historically, our Court has jealously guarded the right against any infringement. *Tortolito v. State*, 901 P.2d 387, 389 (Wyo. 1995), quoting *Clenin v. State*, 573 P.2d 844, 846 (Wyo. 1978).

> "[The privilege against self incrimination] reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; ... our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load" ... [and] *our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"....*"

*United States v. Gecas*, 120 F.3d 1419, 1460 (11th Cir. 1997); citing *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964).

[¶36] Former Justice Fortas eloquently described the cardinal importance of this right in protecting individual liberty:

> "The fundamental value that the privilege reflects is intangible, it is true; but so is liberty, and so is man's immortal soul. A man may be punished, even put to death, by the state; but ... he should not be made to prostrate himself before its majesty. *Mea culpa* belongs to a man and his God. It is a plea that cannot be exacted from free men by human authority. To require it is to insist that the state is the superior of the individuals who compose it, instead of their instrument."

*Gecas*, 120 F.3d at 1459, citing, Abe Fortas, *The Fifth Amendment: Nemo Tenetur Pro-dere Seipsum*, Cleveland Bar Association, The Journal, XXV, Apr. 1954, at 91, 99-100.

[¶37] I disagree with the State's position that it is acceptable for officers to require a defendant to confess to possession in order to avoid facing felony charges. Mr. Barrera did not have a valid option to not have the controlled substance in his possession when he was taken into the jail. The questions posed by the officers did not constitute a valid option for Mr. Barrera which indicated he voluntarily was taking controlled substances into the jail.

[¶38] The approach advanced by the State here not only interferes with the privilege against self-incrimination, it encourages officers to incarcerate individuals who are arrested for the most minor of crimes, in the hopes that a further search produces evidence of a felony. If the State can require anyone taken into a county jail to confess to possession or face a felony charge, officers have incentive to take everyone to jail.

[¶39] The purpose of § 6-5-208 is obvious. The legislature seeks to keep controlled substances out of jails where they might be used by inmates or others. Persons who take substances into jails, then, are subjected to felony sanctions. The actions of Mr. Barrera, however, had no connection to that legislative purpose. There was no possibility that Mr. Barrera's controlled substance would accompany him into the jail as an inmate. In fact, there was no possibility that Mr. Barrera's controlled substance would not be found by law enforcement, as they conducted the "strip search." The conclusion that Mr. Barrera "took" a controlled substance into a jail does not fit the obvious intent of this legislation.

[¶40] There may be situations where an individual going into jail involuntarily nevertheless has voluntarily taken controlled substances there. The majority opinion provides the example of an inmate on work release who voluntarily chooses to bring controlled substances with him into the jail upon his return from work. Perhaps someone might know they are going to be arrested, and conceal controlled substances in a manner indicating they hoped to somehow get them

into the jail. Such circumstances could support a conclusion that the actor chose, or was acting voluntarily, in taking the controlled substances into a jail. Those are not the facts of Mr. Barrera's case.

[¶41] Under the facts of this case, I conclude that Mr. Barrera did not voluntarily take controlled substances into the jail.