NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

ALEX TRENTON BELTZ,

Petitioner,

v.

STATE OF ALASKA,

Respondent.

Court of Appeals No. A-13742
Trial Court No. 4FA-19-03522 CR

O P I N I O N

STATE OF ALASKA,

Petitioner,

v.

LESLI RENEE RICHARDSON,

Respondent.

Court of Appeals No. A-13775
Trial Court No. 3KN-20-00750 CR

No. 2780 — June 7, 2024

Petitions for Review from the Superior Court, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge, and Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: Nico Ambrose (petition) and Megan R. Webb (briefing and oral argument), Assistant Public Defenders, and Samantha Cherot, Public Defender, Anchorage, for Petitioner Beltz. Ann B. Black, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney

General, Juneau, for Respondent (A-13742), and Petitioner (A-13775). Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, under contract with the Office of Public Advocacy, Anchorage, for Respondent Richardson.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD, writing for the Court.
Judge WOLLENBERG, concurring.

A person commits the crime of second-degree promoting contraband under AS 11.56.380(a) if the person (1) "introduces, takes, conveys, or attempts to introduce, take, or convey contraband into a correctional facility" or (2) "makes, obtains, possesses, or attempts to make, obtain, or possess anything that person knows to be contraband while under official detention within a correctional facility." Second-degree promoting contraband is a class A misdemeanor, but the crime is elevated to first-degree promoting contraband under AS 11.56.375(a) — a class C felony — if the contraband is, *inter alia*, a controlled substance. In these consolidated petitions for review, we are called upon to construe the promoting contraband statutes in the context of arrestees who were found to possess contraband while being booked into a correctional facility.

After correctional officers found drugs on their persons during the booking process following their arrests, Alex Trenton Beltz and Lesli Renee Richardson were charged with unlawful possession of controlled substances.[1] They were also separately indicted on the felony crime of promoting contraband in a correctional facility.[2] Beltz and Richardson moved to dismiss the promoting contraband charges, arguing that the State had failed to establish that they acted voluntarily in bringing drugs into the

---

[1] AS 11.71.050(a)(4) and AS 11.71.040(a)(12), respectively.

[2] AS 11.56.375 & AS 11.56.380.

correctional facilities. In Beltz's case, the Fairbanks superior court denied the motion; in Richardson's case, the Kenai superior court granted the motion and dismissed the charge.

In these consolidated petitions for review, the parties dispute what "voluntary act" is required to establish criminal liability under the promoting contraband statute for arrestees who are brought to a correctional facility. Beltz and Richardson argue that, for purposes of Alaska's promoting contraband statute, an arrestee must take an affirmative step to hide contraband on their person at a point when they know they are likely going to jail. The State, meanwhile, asserts that an arrestee's failure to terminate possession of contraband after being given an opportunity to do so is sufficient to establish a voluntary act.

For the reasons explained in this opinion, we hold that an arrestee commits the "voluntary act" required by the promoting contraband statute when the arrestee has actual notice or is otherwise aware that maintaining possession of contraband in the correctional facility constitutes a separate criminal offense and, after being given an opportunity to terminate possession, continues to conceal illegal drugs.

In light of this holding, and the facts of each case as presented to the superior court, we reverse the denial of the promoting contraband charge in Beltz's case, and we affirm the dismissal of the promoting contraband charge in Richardson's case.

*Why we conclude that an arrestee acts voluntarily in introducing contraband into a correctional facility when the arrestee is given an opportunity to terminate their possession of illegal drugs and fails to do so, despite knowledge that promoting contraband is an additional offense*

Under Alaska law, "The minimal requirement for criminal liability is the performance by a person of conduct that includes a voluntary act or the omission to

– 3 –                                                                2780

perform an act that the person is capable of performing."[3] A "voluntary act" is defined as "a bodily movement performed consciously as a result of effort and determination" — and it "includes the possession of property if the defendant was aware of the physical possession or control for a sufficient period to have been able to terminate it."[4]

The voluntariness of a defendant's conduct is an implicit element of all crimes.[5] If a defendant actively disputes voluntariness, the defendant is entitled to a jury instruction on this defense, and the State must prove the element of voluntariness beyond a reasonable doubt.[6] A defendant raising a claim of involuntariness "seeks to challenge the State's proof of the *actus reus* of the crime, rather than the defendant's mental state."[7] That is, "the defendant intends to argue that there is reasonable doubt as to the *voluntariness* of his acts (as that term is defined under criminal law)."[8]

The parties in this case agree that there must be *some* voluntary act underlying the promoting contraband charge — and they also generally agree that an arrestee's act of promoting contraband cannot be considered "voluntary" under Alaska law unless the arrestee, at a minimum, has a meaningful opportunity to surrender the contraband.[9] But the parties disagree as to the scope of the "voluntary act" that an arrestee must engage in to be liable for bringing contraband into a correctional facility.

---

[3] AS 11.81.600(a).

[4] AS 11.81.900(b)(68).

[5] *See, e.g.*, *State v. Simpson*, 53 P.3d 165, 169 (Alaska App. 2002); *Palmer v. State*, 379 P.3d 981, 989 (Alaska App. 2016).

[6] *See Simpson*, 53 P.3d at 169; *Palmer*, 379 P.3d at 989.

[7] *Palmer*, 379 P.3d at 989.

[8] *Id.*

[9] *See* AS 11.81.900(b)(68).

As we noted above, subsection (a)(1) of Alaska's promoting contraband statute precludes a person from "introduc[ing], tak[ing], convey[ing], or attempt[ing] to introduce, take, or convey contraband into a correctional facility."[10]  On appeal, Beltz and Richardson argue that arrestees do not act voluntarily within the meaning of this provision unless they take affirmative steps to conceal contraband when they know they are likely going to jail.

In support of their position, Beltz and Richardson rely on the minority view among courts.  The leading case reflecting this minority view is the Oregon Court of Appeals's decision in *State v. Tippetts*.[11]  In *Tippetts*, the defendant was arrested and brought to the jail, where an officer asked him whether he had any knives, needles, or drugs.[12]  The officer searched the defendant and found a bag of marijuana that the defendant had not disclosed.[13]  The defendant was charged with Oregon's equivalent of promoting contraband.[14]

During trial, the defendant moved for a judgment of acquittal, arguing that no reasonable jury could find that he had acted voluntarily because, following his arrest,

---

[10]   AS 11.56.380(a)(1).  We note that the State actually charged Beltz and Richardson under both theories of promoting contraband.  *See* AS 11.56.380(a)(1)-(a)(2).  Beltz and Richardson contend that they should only be charged under subsection (a)(1).  We tend to agree with Beltz and Richardson, and the concurrence, that arrestees are properly charged under subsection (a)(1), but we need not directly address this point given our resolution of these petitions.

[11]   *State v. Tippetts*, 43 P.3d 455 (Or. App. 2002).

[12]   *Id.* at 456.

[13]   *Id.*

[14]   *Id.* (citing Or. Rev. Stat. § 162.185(1)(a)).

he could not avoid taking drugs into jail.[15] The trial court denied the motion, reasoning that the defendant could have avoided the charge by simply admitting to possessing controlled substances before the officers discovered the drugs.[16]

The Oregon Court of Appeals reversed the conviction.[17] The court held that, to support a conviction for supplying contraband under these circumstances, the State needed to prove "(1) that [the] defendant either initiate[d] the introduction of contraband into the jail or cause[d] it to be introduced and (2) that he d[id] so consciously."[18] The court reasoned that the defendant "did not initiate the introduction of the contraband into the jail or cause it to be introduced in the jail. Rather, the contraband was introduced into the jail only because the police took [the] defendant (and the contraband) there against his will."[19]

The Oregon court acknowledged that an arrestee *could* potentially be liable for introducing contraband into a correctional facility but only under limited circumstances — *i.e.*, where the involuntary act was "a reasonably foreseeable or likely

---

[15]  *Id.*

[16]  *Id.*

[17]  *Id.* at 460.

[18]  *Id.* at 457.

[19]  *Id.* The Oregon Court of Appeals has extended this logic to charges brought under the other subsection of Oregon's contraband statute — *i.e.*, to a person "confined in a correctional facility" who is charged with knowingly *possessing* contraband. *See State v. Gotchall*, 43 P.3d 1121, 1122 (Or. App. 2002) (per curiam) ("If [the] defendant did not voluntarily introduce contraband into the correctional facility, we do not see how, on these facts, she could voluntarily possess that contraband once she was confined in the facility."); *see also* Or. Rev. Stat. § 162.185(1)(b).

consequence of the voluntary act on which the state seeks to base criminal liability."[20] Because the State did not dispute that the defendant's involuntary transport to jail was an intervening cause of the drugs being introduced into jail, and because, according to the court, "no reasonable juror could find that the introduction of contraband into the jail was a reasonably foreseeable consequence of possessing it," the court concluded that the State presented insufficient evidence to establish that the arrestee voluntarily introduced drugs into the jail.[21]

Two other states have reached conclusions consistent with this minority view. Both New Mexico and Washington have held that a person must enter jail voluntarily in order to commit the voluntary act sufficient to establish liability for carrying or possessing a controlled substance in jail.[22]

---

[20]  *Tippetts*, 43 P.3d at 459-60 (citing *Model Penal Code* § 2.01, 120 (Tentative Draft No. 4 1955)); *see State v. Thaxton*, 79 P.3d 897, 900 (Or. App. 2003) (upholding contraband conviction when the defendant stuffed marijuana in his sock at a time when he knew that officers were likely to arrest him and take him to jail, and thus "putting the marijuana in the sock was a voluntary act directed toward introducing the contraband to the jail").

[21]  *Tippetts*, 43 P.3d at 459-60; *see also State v. Gonzalez*, 71 P.3d 573, 574 (Or. App. 2003) (per curiam) (holding that "mere possession of drugs when [the defendant] was taken by police to a correctional facility is not legally sufficient to prove that he voluntarily introduced contraband into that facility . . . even if, as the state argues, defendant's arrest and the discovery of the drugs were 'readily foreseeable consequences' of his prearrest conduct." (citing *State v. Delaney*, 71 P.3d 93 (Or. App. 2003) (per curiam))); *State v. Ortiz-Valdez*, 79 P.3d 371, 373 (Or. App. 2003) (concluding no criminal liability where "defendant merely passively continued to possess drugs that were in his possession beforehand" and "did nothing affirmatively or consciously to take possession of the drugs or hide them on his person at a point that he knew that he was likely going to jail").

[22]  *See State v. Cole*, 164 P.3d 1024, 1027 (N.M. App. 2007) (holding, that to be guilty of "bringing contraband into a jail," a person must "enter the jail voluntarily," and it is "of no moment" that the defendant "could have avoided the charge . . . by admitting to the

(continued...)

But the vast majority of courts reject this approach in favor of a different conception of the necessary "voluntary act." The Idaho Supreme Court's decision in *State v. Gneiting* is representative of this majority view.[23] In *Gneiting*, the defendant was arrested for possessing controlled substances and drug paraphernalia.[24] The arresting officer "asked [the defendant] multiple times whether she had anything illegal on her and warned her that if she took illegal items into the jail, she would receive an additional charge."[25] The defendant denied possessing anything illegal.[26] During a strip search, however, officers found methamphetamine on the defendant's person.[27]

The State charged the defendant with, among other things, felony possession of contraband within a correctional facility.[28] After a jury found her guilty of possessing contraband, the defendant appealed, arguing that the State had failed to prove that she voluntarily brought contraband into a correctional facility.[29]

The Idaho Supreme Court rejected this claim. The court surveyed decisions from other jurisdictions and noted that, under the majority view, "an arrestee, having

---

[22]   (...continued)
booking officer that he possessed marijuana"); *State v. Eaton*, 229 P.3d 704, 706 (Wash. 2010) (en banc) (holding that a sentence enhancement for possession of a controlled substance in a jail required a finding that the defendant "took a volitional act to place himself" in the jail).

[23]   *State v. Gneiting*, 468 P.3d 263 (Idaho 2020).

[24]   *Id.* at 265.

[25]   *Id.*

[26]   *Id.*

[27]   *Id.*

[28]   *Id.*

[29]   *Id.* at 265-66.

been advised that bringing an illegal substance into a correctional facility will constitute a separate offense, makes a voluntary choice to possess the contraband within the correctional facility when she continues to conceal, or fails to disclose, the contraband on her person."[30] The Idaho court adopted this interpretation of law, ruling that the defendant's possession of drugs within the jail was voluntary because she made the choice to continue possessing drugs even after being provided multiple opportunities to give up the contraband.[31]

The court also rejected the defendant's claim that any "choice" she had to relinquish her possession of the drugs was not truly voluntary since it would have required her either to incriminate herself by admitting to drug possession or remain silent and risk ultimately being charged with possessing contraband: "[H]aving to make a difficult choice regarding whether to invoke the right to remain silent does not violate the Fifth Amendment."[32]

At least eleven other courts have reached the same, or a similar, conclusion.[33]

---

[30]   *Id.* at 267-70.

[31]   *Id.* at 268-70.

[32]   *Id.* at 270-71.

[33]   *See, e.g.*, *Barrera v. State*, 403 P.3d 1025, 1027-29 (Wyo. 2017) (finding that a defendant acted voluntarily where the defendant was advised that bringing contraband into a detention facility would constitute a felony and the defendant denied possessing such contraband); *State v. Cargile*, 916 N.E.2d 775, 777 (Ohio 2009) (noting that the defendant "affirmatively concealed the drugs by stating to the arresting officer that he did not possess anything . . . despite the warning [the defendant] received that if he brought drugs into the detention facility he would be committing a felony"); *Taylor v. Commonwealth*, 313 S.W.3d 563, 565 (Ky. 2010) (holding that a defendant committed a voluntary act when, despite being warned of possible felony charges and having an opportunity to dispose of contraband, the

(continued...)

In advocating against this majority approach, Beltz and Richardson focus on the potential unfairness of requiring arrestees who possess illegal drugs to essentially incriminate themselves in order to avoid prosecution for promoting contraband. Beltz also asserts that requiring arrestees to voluntarily reveal any illegal controlled substances

---

[33] (...continued) defendant did not disclose the presence of contraband before entering a detention center); *Brown v. State*, 89 S.W.3d 630, 631-32 (Tex. Crim. App. 2002) (en banc) (noting that defendants were informed that "they needed to tell [the deputy] about any contraband that was possessed, such as drugs or weapons, before they stepped inside the jail"); *State v. Alvarado*, 200 P.3d 1037, 1042 (Ariz. App. 2008) (holding that a defendant's voluntary act was established by "both the arresting officer and the detention officer inform[ing the] defendant of the consequences of bringing contraband into the jail and [giving] him an opportunity to surrender any contraband"); *People v. Low*, 232 P.3d 635, 638 (Cal. 2010) (holding that a defendant acted voluntarily when he was given "advance warning" of California's promoting contraband statute but "violated its terms despite ample opportunity to avoid doing so"); *State v. Winsor*, 110 S.W.3d 882, 888 (Mo. App. 2003) (holding that a defendant committed the voluntary act of promoting contraband by choosing to enter the jail while in possession of a controlled substance despite being informed that "bringing a controlled substance onto the premises of the county jail constituted a felony"); *Herron v. Commonwealth*, 688 S.E.2d 901, 906 (Va. App. 2010) (holding that a defendant committed the requisite voluntary act when the defendant failed to disclose contraband despite being provided an opportunity to do so and "advised of the consequences of bringing drugs into the jail"); *Baker v. State*, 208 N.E.3d 626, 641 (Ind. App. 2023) (holding that a defendant was informed of the consequences of possessing contraband in a jail but ignored that warning and thus committed a voluntary act); *People v. McClintic*, 484 P.3d 724, 728 (Colo. App. 2020) (concluding no voluntary act where the defendant "neither concealed nor attempted to conceal her [contraband], but . . . voluntarily gave it to the police" during the booking process); *State v. Carr*, 2008 WL 4368240, at *5 (Tenn. Crim. App. Sept. 26, 2008) (unpublished) (concluding that the defendant acted voluntarily because, "after being advised of the consequences of bringing drugs into the jail, the [defendant] consciously chose to ignore the officers' warnings, choosing instead to enter the jail in possession of [contraband]").

they may possess in order to avoid being prosecuted for promoting contraband presents the same sort of unconstitutional dilemma presented in *Gudmundson v. State*.[34]

The defendants in *Gudmundson* were hunters who killed a Dall sheep in an area that was closed to hunting for that species.[35] After illegally killing the sheep, they were left with a "cruel dilemma."[36] If they left the sheep where it was, they would be guilty of wanton waste (AS 16.30.010(a)); if they brought it with them, they would be guilty of transporting illegally taken game (5 Alaska Administrative Code 92.140).[37] The hunters chose to leave the sheep and were subsequently prosecuted for, and convicted of, wanton waste.[38] The supreme court vacated their convictions, agreeing with them that substantive due process was violated because the relevant statute and regulation created irreconcilable duties after illegally taking game.[39]

But as the State points out, arrestees like Beltz and Richardson are not faced with committing a new offense no matter what choice they make. Rather, an arrestee who possesses an illegal controlled substance on their person commits a crime (the crime of possession) before ever entering a correctional facility. The arrestee commits an *additional* crime only by choosing to maintain possession after becoming aware that introducing contraband into a correctional facility constitutes a separate offense. If the

---

[34] *Gudmundson v. State*, 822 P.2d 1328 (Alaska 1991).

[35] *Id.* at 1328; *see also* 5 Alaska Administrative Code 80.300(B) (repealed 1989) (prohibiting taking game in a closed area).

[36] *Gudmundson*, 822 P.2d at 1329 (quoting *Gudmundson v. State*, 763 P.2d 1360, 1361 (Alaska App. 1988)).

[37] *Id.* at 1332-33.

[38] *Id.* at 1329.

[39] *Id.* at 1333.

arrestee relinquishes the drugs, the arrestee is not committing a *new* offense at all.[40] We

therefore agree with the State that arrestees do not face the same "cruel dilemma" that

the defendants in *Gudmundson* faced.[41]

We also agree with the majority of courts that have held that the privilege

against self-incrimination does not preclude criminal liability for failing to relinquish any

contraband on one's person. As these courts have explained, the statutes criminalizing

promoting contraband punish the act of failing to surrender contraband, not the right to

remain silent.[42]

Moreover, an arrestee has no legal right to possess contraband in a

correctional facility. As the Alaska Supreme Court has similarly recognized, the Fifth

Amendment does not protect a defendant's decision to lie, nor does it create "a privilege

to commit a crime."[43] We have previously rejected arguments that statutes criminalizing

acts like refusal to submit to a breath test violate the privilege against self-

---

[40] *See Greinier v. State*, 23 P.3d 1192, 1196 (Alaska App. 2001) (rejecting defendant's argument that her conviction was the result of a due process dilemma similar to that in *Gudmundson*, when defendant was not faced with inevitably committing a *new* crime but rather providing statements that could conceivably be used to prove her complicity in a *previous* crime).

[41] *See Wing v. State*, 268 P.3d 1105, 1109-10 (Alaska App. 2012) (explaining that a defendant is not unconstitutionally forced to commit a *new* crime when choosing between providing a breath sample and refusing to submit to a breath test because the breath test merely obtains evidence of whether a driver is or is not *already* above the statutory limit).

[42] *See, e.g.*, *State v. Gneiting*, 468 P.3d 263, 271 (Idaho 2020) (explaining that the invocation of the right to silence does not "prevent law enforcement from searching an arrestee who has been brought into a correctional facility"); *State v. Cargile*, 916 N.E.2d 775, 777-78 (Ohio 2009); *Taylor v. Commonwealth*, 313 S.W.3d 563, 566 (Ky. 2010).

[43] *Webb v. State*, 580 P.2d 295, 302 (Alaska 1978) (quoting *State v. Falco*, 292 A.2d 13, 21 (N.J. 1972)).

incrimination.[44] We find persuasive the views of several courts that have addressed the issue of whether premising liability for promoting contraband on a defendant's refusal to disclose possession of it and concluded that such a choice, though difficult, does not violate a defendant's privilege against self-incrimination when the choice is made with awareness of the legal consequences of that refusal.[45]

That said, we recognize the inherent unfairness of advising arrestees of their *Miranda* rights and then expecting them to subject themselves to possible prosecution by voluntarily relinquishing any illegal drugs they may possess. The Alaska Supreme Court has recognized a similar potential unfairness in the context of refusal to submit to a breath test. In *Graham v. State*, the supreme court acknowledged the risk that an arrestee could erroneously believe that the rights contained in the *Miranda* warning apply to the breath test and that their right to silence includes their right to refuse a breath test.[46] The court therefore held that, if a person arrested for driving under the influence appears confused about their rights, "the officer must clearly advise that person that the

---

[44] *See, e.g.*, *Leslie v. State*, 711 P.2d 575, 578 (Alaska App. 1986); *Svedlund v. Anchorage*, 671 P.2d 378, 381 (Alaska App. 1983); *see also Palmer v. State*, 604 P.2d 1106, 1109 (Alaska 1979).

[45] *See, e.g.*, *Cargile*, 916 N.E.2d at 777-78 (noting that the Fifth Amendment does not confer a privilege to lie or be protected from making difficult choices regarding whether to remain silent); *Taylor*, 313 S.W.3d at 566 (recognizing that "a number of courts have rejected the notion that there is a right to be protected from having to make difficult choices regarding whether to invoke the Fifth Amendment right against self-incrimination"); *People v. Low*, 232 P.3d 635, 649 (Cal. 2010) (explaining that "[t]he Fifth Amendment privilege against self-incrimination does not remove every difficult choice 'of the guilty suspect's own making'" (quoting *Brogan v. United States*, 522 U.S. 398, 404 (1998))).

[46] *See Graham v. State*, 633 P.2d 211, 214-15 (Alaska 1981).

rights contained in the *Miranda* warning do not apply to the breathalyzer examination."[47] As a result of the supreme court's decision in *Graham*, breath test advisories now contain an explicit warning that the right to remain silent does not include the right to refuse the breath test.[48]

Although we believe that a similar advisory may be appropriate in the context of arrestees facing potential promoting contraband charges, we do not mandate it in this case.[49] We do however require, as a matter of due process, that the defendant have notice or be otherwise aware that promoting contraband is an additional offense, separate from the offense of mere possession. Such knowledge ensures that the defendant is making a knowing and voluntary decision when they fail to terminate their possession of illegal drugs when given the opportunity to do so. We note that the easiest way to accomplish such notice is through the use of affirmative warnings prior to or

---

[47] *Id.* at 215.

[48] *See, e.g.*, *Rask v. State*, 404 P.3d 1236, 1240-42 (Alaska App. 2017) (discussing the manner in which a defendant may be notified that refusing to submit to a breath test constitutes a crime); *Olson v. State*, 260 P.3d 1056, 1058, 1064 (Alaska 2011) (reversing and remanding for a defendant to show that they were prejudiced by an incorrect warning regarding the consequences of refusing a breath test); *Fee v. State*, 825 P.2d 464, 467 (Alaska App. 1992) (reversing a defendant's conviction for refusal to submit to a chemical test because the defendant "was not clearly advised that his *Miranda* rights" did not protect his refusal to submit to chemical testing); *Bodey v. State*, 2009 WL 929434, at *2 (Alaska App. Apr. 8, 2009) (unpublished).

[49] We note in this context that the purpose of the promoting contraband statute of keeping prohibited items out of correctional facilities is best served by encouraging people to relinquish their contraband, rather than simply increasing criminal exposure for those caught with prohibited items in the booking process. *See Rask*, 404 P.3d at 1242 (Suddock, J., concurring) (encouraging the State to revise its breath test warning based on proven techniques for writing effective warnings because doing so will likely decrease the number of breath test refusals).

during the booking process. A review of case law from other jurisdictions demonstrates that such warnings are standard in many jurisdictions.[50] But the lack of affirmative warnings in a given case is not necessarily dispositive, as the requisite awareness may be proven through other evidence, including but not limited to, a defendant's pre- and post-arrest conduct and statements.

In its briefing, the State relies heavily on a decision by the North Carolina Court of Appeals, *State v. Barnes*.[51] Although sometimes characterized as part of the "majority" approach, *Barnes* is distinguishable from the other cases in the majority approach because it does not include any warnings or require that the defendant have a meaningful opportunity to voluntarily relinquish any illegal drugs they may have on their

---

[50] *See, e.g.*, *State v. Cole*, 164 P.3d 1024, 1025, 1027 (N.M. App. 2007) (noting that defendant was provided with a form explicitly warning him about the consequences of failing to disclose contraband, though nevertheless adopting the minority position that a defendant brought to a correctional facility while under arrest does not commit a voluntary act); *State v. Alvarado*, 200 P.3d 1037, 1038-39 (Ariz. App. 2008) (noting that both a police officer and detention officer warned defendant of the consequences of introducing contraband into a jail); *Cargile*, 916 N.E.2d at 776 (noting that the defendant was twice warned that he should disclose any drugs or weapons because bringing such items into the jail could be charged as a felony); *Barrera v. State*, 403 P.3d 1025, 1028-29 (Wyo. 2017) (explaining that "courts adopting the majority position [regarding the voluntary act of introducing contraband] focus on a choice made by arrestees after they have been advised that a failure to disclose they were carrying drugs prior to entering a jail would result in a felony prosecution"); *State v. Gneiting*, 468 P.3d 263, 270 (Idaho 2020); *Taylor*, 313 S.W.3d at 565; *Brown v. State*, 89 S.W.3d 630, 631-32 (Tex. Crim. App. 2002) (en banc); *Low*, 232 P.3d at 638; *State v. Winsor*, 110 S.W.3d 882, 888 (Mo. App. 2003); *Herron v. Commonwealth*, 688 S.E.2d 901, 906 (Va. App. 2010); *Baker v. State*, 208 N.E.3d 626, 641 (Ind. App. 2023); *State v. Carr*, 2008 WL 4368240, at *5 (Tenn. Crim. App. Sept. 26, 2008) (unpublished).

[51] *State v. Barnes*, 747 S.E.2d 912 (N.C. App. 2013), *aff'd*, 756 S.E.2d 38 (N.C. 2014).

person.[52] Instead, *Barnes* relies solely on the act of possession as the necessary voluntary act.[53]  In other words, a defendant is guilty of promoting contraband under North Carolina law if the defendant's original possession was voluntary, even though the defendant could not have foreseen at that time that they would be arrested and then involuntarily transported to a correctional facility.[54]

We disagree with this reasoning, as do the majority of courts included in the "majority" approach.  As the Wyoming Supreme Court noted, "[C]ourts adopting the majority position focus on a choice actually made by arrestees after they have been advised that a failure to disclose they were carrying drugs prior to entering a jail would result in a felony prosecution."[55]  We agree with Wyoming and the other majority courts that the voluntary act that is the basis for imposing criminal liability for promoting contraband rests on the defendant's conscious decision to maintain possession of their illegal drugs in the correctional facility despite their knowledge that failing to relinquish their drugs will constitute the additional crime of promoting contraband.

---

[52]  *Id.* at 920-21; *see also Gneiting*, 468 P.3d at 268 (listing *Barnes* among the majority approach).

[53]  *Barnes*, 747 S.E.2d at 920.  Under North Carolina law, simple possession of a controlled substance is a lesser included offense of North Carolina's "possession of a controlled substance in a penal institution or local confinement facility" statute, meaning that a defendant cannot be convicted of both crimes.  *Id.* at 922.  We have held that under Alaska law, however, mere possession of a controlled substance is not a lesser included offense of promotion of contraband, and that a conviction for both does not violate the prohibition on double jeopardy.  *See Lampkin v. State*, 141 P.3d 362, 364, 366 (Alaska App. 2006).

[54]  *Barnes*, 747 S.E.2d at 920-21.

[55]  *Barrera*, 403 P.3d at 1028-29 (interpreting the Wyoming statute consistently with the majority view).

With these principles in mind, we now turn to the specific facts of Beltz's and Richardson's cases.

### *Why we reverse the denial of Beltz's motion to dismiss his indictment*

Beltz was arrested for trespassing after he entered a stranger's apartment in an effort to avoid the police who were responding to a call about juveniles smoking drugs at an apartment complex.

The arresting officer later testified at the grand jury hearing that when she placed Beltz in handcuffs, she saw syringes sticking out of his pocket. Beltz also gave the arresting officer a fake name when he was arrested.[56] The officer subsequently transported Beltz to the Fairbanks Correctional Center (FCC) for booking.

Later in the grand jury proceeding, a grand juror asked the arresting officer if she had asked Beltz if he had any drugs on him. The officer responded as follows:

> What I normally do when someone is handcuffed is I go through a whole spiel where I ask them do you have [a] weapon[?] . . . Do you have anything that's going to poke me or stick me[?] Do you have anything that's going to get you in trouble at the jail[?] Usually I do that as soon as handcuffs go on. Now in this situation — because it was up in the apartment — I know I didn't do it then. I don't recall if I gave him that exact spiel after I had officially arrested him for . . . a different crime. I can say that I normally do that. However, upon entering FCC, there is a warning sign prohibiting weapons, controlled — or I think it's weapons and other chemical substances.

---

[56] Beltz was later identified at Fairbanks Correctional Center after a correctional officer recognized him from "prior contacts" he had with Beltz. (Beltz has a very distinctive neck tattoo.)

After Beltz arrived at FCC, he was strip searched. During the strip search, Beltz pulled a red packet off the bottom of his right foot and swallowed it. The officer subsequently found white packets — later determined to be buprenorphine — between Beltz's butt cheeks.

The correctional officer who strip searched Beltz testified at the grand jury hearing that, when he asked Beltz what was in the packets, Beltz stated that the red one contained "just pieces of cotton that people use to filter their heroin before they shoot it." Beltz stated that the white packets contained "something along the lines of Suboxone . . . just to help him not feel as sick as he began to detox off of whatever he ha[d] been taking."

The grand jury indicted Beltz for first-degree promoting contraband based on his possession of the buprenorphine.[57] Beltz was also separately charged with two misdemeanor counts of fifth-degree misconduct involving controlled substances for possessing the syringes and the buprenorphine, as well as one count of false information.[58]

Beltz moved to dismiss the indictment, arguing that the State did not show that he had acted voluntarily within the meaning of the statute because he was involuntarily brought to the jail. He also contended that the charges violated due process and punished him for exercising his right against self-incrimination.

A Fairbanks superior court judge denied Beltz's motion.

Having reviewed the grand jury record in light of the clarification provided in this opinion, we conclude that the evidence presented to the grand jury failed to

---

[57] AS 11.56.375(a)(3).

[58] AS 11.71.050(a)(4) and AS 11.56.800(a)(1)(B)(i), respectively.

establish that Beltz committed the requisite voluntary act of promoting contraband.[59] Despite the odd location of the buprenorphine, there was no evidence that Beltz was aware that he was going to be arrested and that he concealed the drugs with the purpose of trying to smuggle the drugs into a correctional facility. Nor is there clear evidence that he continued to maintain possession of the illegal drugs despite knowing that promoting contraband was an additional crime that was separate from mere possession. Indeed, it does not appear that Beltz was ever given a meaningful opportunity to voluntarily relinquish the drugs prior to the strip search. The arresting officer could not remember whether she had warned Beltz about taking drugs into the correctional facility and there was no evidence that any of the correctional officers had ever discussed the matter with him.

We acknowledge that the arresting officer testified that there was a sign outside the correctional facility that could have alerted Beltz to the fact that it was a crime to possess drugs while in a correctional facility, and we acknowledge that such a sign should be sufficient to establish the requisite *mens rea* on the part of visitors to a correctional facility who are charged with promoting contraband. But we conclude that such a sign is not alone sufficient in the context of arrestees who are very differently situated than visitors. Whereas a visitor voluntarily comes to the facility and can easily avoid "introduc[ing], tak[ing], [or] convey[ing]" contraband into a correctional facility by leaving the item in their car or in lockers partly provided for that purpose, an arrestee who was arrested while carrying illegal drugs does not have such an option available to them. Although not facing the "cruel dilemma" of the hunters in *Gudmundson*, an arrestee in this situation nevertheless faces a difficult choice of whether to subject

---

[59] *See* Alaska R. Crim. P. 6(r) ("The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant.").

themselves to potential prosecution by voluntarily relinquishing their drugs or whether to risk an additional charge of promoting contraband in the hopes that the drugs will not be discovered during the booking process. In our view, due process requires that this difficult choice be at least a knowing one.

For these reasons, we reverse the denial of Beltz's motion to dismiss the charge of promoting contraband. Beltz's other charges remain.

*Why we affirm the dismissal of Richardson's indictment*

The record before us of Richardson's arrest is very limited. Richardson was charged with fourth-degree misconduct involving controlled substances (possession of heroin) and first-degree promoting contraband, and her case proceeded to a grand jury.[60] A grand jury subsequently indicted her on these offenses.

Richardson moved to dismiss the promoting contraband charge. For reasons that are unclear, the parties did not submit grand jury transcripts to the superior court but instead stipulated to the following facts for purposes of the motion to dismiss indictment:[61]

---

[60] Richardson was later charged with violating conditions of release.

[61] The State suggests in its brief that the grand jury proceeding reveals additional facts beyond the parties' stipulation that would potentially impact the trial court's ruling, and the State asks us to remand so that further factual findings can be made. But the State agreed to submit this case for consideration on a set of stipulated facts and forgo the submission of the grand jury transcript for the superior court's consideration. Thus, the transcript is not part of the appellate record, and we conclude that the State has waived this request. *Cf. Bertilson v. State*, 64 P.3d 180, 185 (Alaska App. 2003) (holding that the defendant waived his challenges to the indictment by failing to ensure that the grand jury transcript was part of the appellate record). We note that the dismissal of the indictment is without prejudice to the State reindicting Richardson on the promoting contraband charge if the State believes that it has sufficient evidence to pursue such a charge under the guidance provided by this

(continued...)

Ms. Richardson was arrested for driving with a suspended or revoked license and brought to Wildwood Pretrial. While being booked in, she was asked if she possessed drugs [or] "things that might poke him." She denied being in possession. However, while in the holding tank, she was caught possessing heroin. She was interviewed by the police and admitted that she possessed the heroin, but stated that she did not admit to it as she did not wan[t] to be charged.

Like Beltz, Richardson moved to dismiss the promoting contraband charge, arguing that the State could not prove she had acted voluntarily within the meaning of the statute because she was involuntarily brought to jail. She also contended that the charges violated due process and punished her for exercising her right against self-incrimination.

The Kenai superior court granted Richardson's motion to dismiss. The court concluded that criminal liability required "a voluntary choice." In the limited factual account it had been asked to evaluate, the court found no evidence that Richardson had made the requisite voluntary choice and that her conduct did not go beyond "mere possession."

The State asks us to reverse the superior court order dismissing Richardson's charge. But based on the limited factual record before us, there is little evidence suggesting that Richardson was on notice that continuing to possess drugs within the facility was its own offense. There is no evidence that she was warned of the consequences, on either this or a prior occasion. While Richardson's denial during the booking process that she possessed drugs, and her later admission that she did not disclose her possession of heroin because she did not want to be charged with possessing it, are certainly relevant to whether Richardson had an opportunity to surrender the drugs

---

[61] (...continued)
opinion.

and nonetheless chose not to do so, we conclude that, on the stipulated facts submitted to the court, the court correctly dismissed the indictment for promoting contraband.

*Conclusion*

Accordingly, we REVERSE the denial of Beltz's motion to dismiss the charge of promoting contraband, and we AFFIRM the order dismissing the charge for promoting contraband in Richardson's case.

Judge WOLLENBERG, concurring.

The Court today holds that, in order for an arrestee who is brought to a correctional facility with drugs on their person to be criminally liable for promoting contraband, the arrestee must have knowledge that maintaining possession of contraband in the correctional facility constitutes a separate criminal offense and continue to conceal the drugs after being given an opportunity to terminate possession. The Court grounds this ruling in the question of voluntariness — *i.e.*, whether and when an arrestee's act of introducing drugs to a correctional facility may be deemed a voluntary act.

In my view, the "voluntary act" framing is not the ideal lens through which to view the issue in this case. It is, of course, true that an arrestee is not, as a general matter, brought to a correctional facility voluntarily. And the fact that an arrestee is brought to the correctional facility against their will (and often unexpectedly) is what contributes to a sense of unfairness at charging an arrestee not only with drug possession — generally, a misdemeanor[1] — but also an additional felony-level crime, in the absence of proof that the arrestee intentionally sought to introduce drugs into the facility.[2]

---

[1] *See* AS 11.71.050-.060.

[2] *State v. Barnes*, 747 S.E.2d 912, 921 (N.C. App. 2013) (recognizing the "equitable appeal" of the notion that it is "unfair to punish a defendant who chooses to possess a controlled substance and is then arrested and taken into custody without voluntarily surrendering the controlled substances in his possession as severely as a defendant who deliberately chooses to introduce controlled substances into a penal institution"); *cf. Martin v. State*, 17 So. 2d 427, 427 (Ala. App. 1944) (reversing conviction for public intoxication due to the lack of a voluntary act by the defendant where law enforcement officers removed the defendant from his home and into the public); *Fontaine v. State*, 762 A.2d 1027, 1031-32 (Md. App. 2000) (holding that the defendant, who was arrested in Delaware but transported to Maryland for processing, was not present in Maryland voluntarily and thus could not be convicted in Maryland of intending to distribute the drugs found on his person during a strip

(continued...)

But, in my view, approaching the issue in these petitions through the lens of statutory interpretation is a cleaner approach that more closely comports with the legislative intent to deter people from bringing contraband into the facility.[3]

Alaska Statute 11.56.380 defines the base-level offense of second-degree promoting contraband, and it sets out two separate ways an individual can commit the offense — *i.e.*, if the person:

> (1) introduces, takes, conveys, or attempts to introduce, take, or convey contraband into a correctional facility; or
>
> (2) makes, obtains, possesses, or attempts to make, obtain, or possess anything that person knows to be contraband while under official detention within a correctional facility.

Second-degree promoting contraband is a class A misdemeanor.[4] The misdemeanor offense is elevated to first-degree promoting contraband — a class C felony — when the contraband is a deadly or defensive weapon, an item intended to be used to facilitate escape, or a controlled substance.[5]

Beltz and Richardson were each charged with one count of first-degree promoting contraband, pursuant to both theories of liability. They argue, however, that they should only have been charged under subsection (a)(1). I agree with this view —

---

[2]  (...continued)
search).

[3]  *See* Audio of House Judiciary Committee, House Bill 661, discussion between Legislative Staff Counsel Barry Stern and Reps. Ed Dankworth, Terry Gardiner, and Lisa Rudd, Tape 13, at 37:20 - 38:59 (Feb. 23, 1978) (noting concern over people trying to get "dangerous items" into institutions, including "maximum security institutions").

[4]  AS 11.56.380(b).

[5]  AS 11.56.375.

and further reason that Beltz and Richardson should have been charged solely with *attempting* to introduce, take, or convey contraband into a correctional facility.

I recognize that this statutory approach has not been fully briefed by the parties, and my conclusions are therefore necessarily tentative. Nevertheless, I take this opportunity to lay out what I consider to be a preferable statutory analysis because I believe that the majority's framing raises difficult issues and risks being overly broad.[6]

As this Court explained in *Hillman v. State*, the legislative history of the second-degree promoting contraband statute "unambiguously demonstrates that the legislature intended the two subsections to apply to two different groups of people."[7] In particular, the Commentary to Alaska's Revised Criminal Code states, in relevant part, that the crime of promoting contraband can be committed both by persons bringing contraband into the facility and by persons already confined at the facility:

> Note that the crimes can be committed by either the person who *brings the contraband into the facility* (§ 380 (a) (1)) or the *person confined in the facility* (§ 380 (a) (2)). Use of the culpability term "knows" in § 380 (a) (2) and its absence in (a) (1) indicates that the person who brings the contraband into the facility is not required to know that the item is contraband. Recklessness is sufficient as to that element (§ 11.81.610 (b) (2)).[8]

---

[6]   *See, e.g.*, *Zehrung v. State*, 569 P.2d 189, 195 (Alaska 1977), *as modified on reh'g*, 573 P.2d 858 (Alaska 1978) (holding that, as a general matter, "when one is arrested and brought to a jail for a minor offense for which bail has already been set in a bail schedule, [the arrestee] should be allowed a reasonable opportunity to attempt to raise bail before being subjected to the remand and booking procedures and the incident inventory search").

[7]   *Hillman v. State*, 382 P.3d 1198, 1200 (Alaska App. 2016).

[8]   Commentary to Alaska's Revised Criminal Code, 1978 Senate Journal Supp. No. 47 (June 12), at 79 (emphasis added).

In *Hillman*, the defendant was a convicted inmate who was found guilty of promoting contraband under subsection (a)(1) (the "introducing" theory) after correctional officers discovered her with chewing tobacco following a visit with someone who came from outside the prison.[9] On appeal, we reversed her conviction.[10] Relying on the Commentary set out above, we reasoned that "[t]he first subsection (a)(1) was intended to apply to non-incarcerated persons who brought contraband from outside the correctional facility into the facility," while "[t]he second subsection (a)(2) was intended to apply to incarcerated persons who obtain contraband while they are within the correctional facility."[11] Because the defendant was a prisoner serving a sentence who had "obtained" contraband, rather than "introduced" it, we concluded that she was convicted under the wrong theory of guilt.[12]

Arrestees do not fit neatly into either statutory category; they transition from non-incarcerated persons to incarcerated persons as they move into the confinement area of the correctional facility. But the plain language and legislative history of the statute support the view that the appropriate subsection for charging Beltz and Richardson — arrestees who did not succeed in getting drugs into the correctional facility — was subsection (a)(1).[13]

---

[9] *Hillman*, 382 P.3d at 1199.

[10] *Id.* at 1200.

[11] *Id.*

[12] *Id.*

[13] *Id.*; *see also Green v. State*, 541 P.3d 1137, 1143 (Alaska App. 2023) ("When we engage in statutory interpretation, we examine the plain language of the statute, the legislative history, and the legislative purpose of the statute." (citing *Alaska Trustee, LLC v. Bachmeier*, 332 P.3d 1, 7 (Alaska 2014))).

First, the statute distinguishes between people who enter "into" a correctional facility ((a)(1)) and people who are under official detention "within" a correctional facility ((a)(2)).[14] "Correctional facility" is defined as "premises, or a portion of premises, used for the confinement of persons under official detention."[15] As the legislative commentary explains, subsection (a)(2) was intended to apply to persons "*confined*" in the facility[16] — that is, to persons who have already been through the booking process and are in the portion of the facility where confinement occurs.

That subsection (a)(2) is limited to those who are already confined within the facility is evidenced by the plain language of (a)(2), which criminalizes not only "possess[ing]," but also "mak[ing]" and "obtain[ing]" contraband — actions that apply to persons confined within a correctional facility but do not naturally apply to an arrestee who is being brought into the facility. That is, an arrestee would not generally "make" or "obtain," or attempt to make or obtain, contraband at the time of booking; rather, it is only once the arrestee is confined "within [the] correctional facility" that the arrestee can be said to be violating subsection (a)(2) by making, obtaining, or possessing contraband.[17]

---

[14] AS 11.56.380.

[15] AS 11.81.900(b)(9).

[16] Commentary to Alaska's Revised Criminal Code, 1978 Senate Journal Supp. No. 47 (June 12), at 79.

[17] Thus, even though an arrestee is under "official detention," the arrestee is not yet confined "within a correctional facility" for purposes of subsection (a)(2). *See* AS 11.81.900(b)(42) (defining "official detention" as "custody, arrest, surrender in lieu of arrest, or actual or constructive restraint under an order of a court in a criminal or juvenile proceeding, other than an order of conditional bail release"); *cf. Crosby v. State*, 770 P.2d 1154, 1155-57 (Alaska App. 1989) (holding that, while the defendant was under "official
(continued...)

Second, as the Commentary notes, different mental states apply to the two different categories of people — those charged under subsection (a)(1) (who must be reckless as to whether an item is contraband) and those charged under subsection (a)(2) (who must know that an item is contraband).[18] This lends further support to the view that the two subsections were intended to apply to two different groups of people.

Consistent with *Hillman*, therefore, I would conclude that subsection (a)(2) does not apply to the conduct of arrestees like Beltz or Richardson, and that the relevant question is whether Beltz and Richardson — who were discovered with drugs before they were confined in the correctional center — "attempt[ed] to introduce, take or convey" the contraband into the correctional facility, *i.e.*, the area of confinement.

This approach is consistent with practical considerations and with our obligation to avoid construing statutes in a manner that leads to absurd or unconstitutional results.[19] Contraband means "any article or thing which persons confined in a correctional facility are prohibited by law from obtaining, making, or possessing in that correctional facility."[20] Contraband is further defined by regulation in an expansive way that includes items — including tools, keys, and cameras — which

---

[17] (...continued) detention" while on furlough from the Department of Corrections to a residential treatment facility, he was not under "confinement" for purposes of second-degree escape from a "correctional facility").

[18] Commentary to Alaska's Revised Criminal Code, 1978 Senate Journal Supp. No. 47 (June 12), at 79.

[19] *See Williams v. State*, 853 P.2d 537, 538 (Alaska App. 1993).

[20] AS 11.56.390.

are not of a readily illicit nature but which are often possessed during processing into a detention facility.[21]

Visitors regularly carry such items and are generally expected to place them in lockers after they enter the building and before they enter the secure area to visit a prisoner. Arrestees are also typically expected to hand over all of their belongings during the booking process. In its briefing, the State appears to acknowledge that a person must be given an opportunity to relinquish any contraband, and does not argue that an arrestee who voluntarily does so when requested after entry into the jail building is guilty of promoting contraband.[22] I agree that due process and fair notice requires an

---

[21] See 22 Alaska Administrative Code 05.660(b), which defines "contraband" to include:

(1) weapons, including firearms, explosives, knives, hacksaw blades, tear gas, dangerous chemical agents, or any tool or other object that may be used as a weapon, from which a weapon may be fashioned, or that is intended to be perceived as a weapon;
(2) controlled substances, the possession of which is punishable by either criminal or civil penalties, and any other type of medication;
(3) alcohol, including wine, distilled spirits, home brew, and any other type of alcoholic substance;
(4) cameras, sound or video recorders, or any electronic or mechanical receiving or transmitting equipment;
(5) any article, including keys, tools, electronic or mechanical devices, and identification information, intended to be used as a means of facilitating an escape; and
(6) any other article, including money, toiletries, books, food, mail, and pictures, that is introduced, taken, or conveyed into a facility, or made, obtained, or possessed in a facility in a manner intended to frustrate or evade detection.

[22] *See People v. McClintic*, 484 P.3d 724, 728-30 (Colo. App. 2020) (holding that a defendant could not be convicted of introducing contraband where she voluntarily relinquished marijuana when she was asked about it during a search at the jail).

opportunity to relinquish contraband; it is not enough for the State to show that an arrestee, or other person who enters the correctional facility building, was in "mere possession" of contraband in order to establish the crime of promoting contraband.

Accordingly, in my view, because the phrase "correctional facility" means the area of the prison used for the confinement of prisoners, arrestees — who are not yet within the correctional facility — are not generally liable for promoting contraband under subsection (a)(2), a provision that applies only to a person who "makes, obtains, possesses, or attempts to make, obtain, or possess anything that person knows to be contraband while under official detention *within a correctional facility*."[23] Rather, arrestees are generally subject to liability under subsection (a)(1) for "*attempt*[*ing*] to introduce, take, or convey contraband *into* a correctional facility," unless they actually succeed in smuggling it into the prison population.[24]

And under the general definition of "attempt," the State must prove that a person in Beltz's and Richardson's situation *intended* to introduce, convey, or take contraband into the confinement portion of the correctional facility — and that the person took a substantial step toward that end.[25] As I noted, it is not sufficient for the State to

---

[23] AS 11.56.380(a)(2) (emphasis added).

[24] AS 11.56.380(a)(1) (emphasis added).

[25] AS 11.31.100(a) ("A person is guilty of an attempt to commit a crime if, with intent to commit a crime, the person engages in conduct which constitutes a substantial step toward the commission of that crime."); *cf. Commonwealth v. Collier*, 693 N.E.2d 673, 674-76 (Mass. 1998) (holding that, where a third party transported the defendant to within 100 yards of the defendant's former wife, in violation of a protective order, the State was required to show that the defendant intended the act which led to the violation, even though the crime of violating a protective order generally requires only knowledge).

show simply that the person possessed the drugs; the State must show that it was the person's "conscious objective" to take the drugs into the secure part of the facility.[26]

This statutory interpretation better addresses two fundamental weaknesses I see with the majority's approach.

First, I find the Fifth Amendment and due process implications of the majority's approach troubling, and I think there is a significant question as to how an arrestee's privilege against self-incrimination is affected by the compelled disclosure of controlled substances.[27]  As a legal matter, it is true that criminal liability for promoting contraband for an arrestee brought to a correctional facility with drugs is not premised on an arrestee's failure to *admit* to drug possession but rather on "the nontestimonial act of knowingly bringing controlled substances into the correctional facility."[28]  As a practical matter, however, a defendant who is handcuffed and unable to physically turn over any drugs may be compelled to tell the correctional officer of his possession in response to official questioning or risk the addition of a felony charge.[29]

---

[26]  AS 11.81.900(a)(1) ("A person acts 'intentionally' with respect to a result described by a provision of law defining an offense when the person's conscious objective is to cause that result.").

[27]  Both the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Alaska Constitution provide that no person "shall be compelled" in a criminal proceeding "to be a witness against himself."  The Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Alaska Constitution guarantee due process to state criminal defendants.

[28]  *People v. Low*, 232 P.3d 635, 648 (Cal. 2010) (alterations omitted).

[29]  *See Barrera v. State*, 403 P.3d 1025, 1031-32 (Wyo. 2017) (Kautz, J., dissenting) (concluding that, where a detention officer did not give an arrestee the option of refraining from answering his question as to whether the arrestee had illegal substances on his person, or ask the arrestee if he wished to waive his privilege against self-incrimination, but instead

(continued...)

The Alaska Supreme Court's decision in *Gudmundson v. State* supports the notion that requiring a person to choose between incriminating themselves and facing additional criminal liability violates due process.[30] In *Gudmundson*, the court held that a hunter faced with two courses of action, both of which were criminal, "should not have to incriminate himself, nor subject himself to liability for further criminal acts" — and that such a legal conundrum violated substantive due process.[31] The majority approach in these cases may require arrestees to make just such a choice. In contrast, requiring that the State show that it was an arrestee's conscious objective to take drugs into a correctional facility and that the arrestee took a substantial step toward that end solves the voluntariness issue without the additional Fifth Amendment and due process concerns.[32]

Second, the majority's holding that the requisite voluntary act is shown when the arrestee has notice that possession of contraband is an additional offense, and the arrestee then fails to terminate possession of any contraband, casts too wide a net. The obvious intent of the promoting contraband statutes is to prevent dangerous items

---

[29] (...continued) required the arrestee to confess or face a felony charge for taking a controlled substance into the jail, the officer interfered with the arrestee's privilege against self-incrimination); *see generally E.L.L. v. State*, 572 P.2d 786, 788 (Alaska 1977) ("The privilege against self-incrimination applies where the answers elicited could support a conviction or might furnish a link in the chain of evidence leading to a conviction." (citing *McConkey v. State*, 504 P.2d 823, 825-26 (Alaska 1972))).

[30] *Gudmundson v. State*, 822 P.2d 1328, 1333 (Alaska 1991).

[31] *Id.*

[32] Alternatively, I agree with the California Supreme Court that if the defendant is required to communicate knowledge about illegal substances in his possession, "the remedy is to ensure that the statements, and any evidence derived from them, 'cannot be used' against the defendant criminally" in a prosecution for possession. *See Low*, 232 P.3d at 649.

or contraband from entering correctional facilities. But procedures, such as the thorough strip search described by the correctional officer in Beltz's case, are already in place to ensure that an arrestee is unable to enter a correctional facility with contraband.[33] Additional procedures like explicit warnings also serve the statutory goal and should be routine.

Given these protective measures, the majority's approach allows an arrestee to be charged with promoting contraband when there was little to no chance that the arrestee would have actually introduced contraband into a correctional facility and no evidence that this was the arrestee's conscious objective.[34]

On the other hand, the statutory interpretation I have outlined here effectuates the statutory intent of the promoting contraband statutes because it targets only those arrestees who are actually intending to introduce or smuggle contraband into a correctional facility.[35]

---

[33] The correctional officer who conducted the strip search of Beltz testified at the grand jury proceeding that these searches are "thorough," in order to ensure that "no weapons, cell phones, or contraband" are brought into the facility. In the course of these searches, a correctional officer inspects an arrestee's mouth, arms, fingers, feet, genitalia, and buttocks, thereby minimizing the likelihood of an arrestee entering a correctional facility with contraband.

[34] *See Barrera*, 403 P.3d at 1032-33 (Kautz, J., dissenting) (contending that the arrestee did not "take" a controlled substance into a jail where there was "no possibility" that the controlled substance would escape detection during the strip search and accompany him into the jail as an inmate and thus, the arrestee's actions "had no connection to [the] legislative purpose" of keeping controlled substances out of the hands of inmates and others).

[35] *See, e.g.*, *State v. Thaxton*, 79 P.3d 897, 899-900 (Or. App. 2003) (upholding a contraband conviction when the defendant stuffed marijuana in his sock at a time when he knew that officers were likely to arrest him and take him to jail, and thus "putting the marijuana in the sock was a voluntary act directed toward introducing the contraband to the

(continued...)

Employing this analysis, the indictments in these cases — premised on both theories of liability for promoting contraband and not limited to "attempts" to introduce contraband — are flawed. I therefore concur with the Court's opinion.

---

[35] (...continued)
jail"); *Barrera*, 403 P.3d at 1032 (Kautz, J., dissenting) (citing, as an example of a person who could be charged with promoting contraband, an inmate on work release who voluntarily chooses to bring controlled substances to the correctional facility upon his return from work).